

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 6, 2023

**BY ECF AND EMAIL**

The Honorable John P. Cronan
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

    Re:    *United States v. Brandy Arias*, 22 Cr. 411 (JPC)

Dear Judge Cronan:

    The Government respectfully submits this letter in advance of sentencing in the above-captioned case, which is scheduled for February 8, 2022. The defendant Brandy Arias pled guilty to firearms trafficking, in violation of 18 U.S.C. §§ 922(a)(1)(A), 924(a)(1)(D), and 2, and interstate transportation and receipt of firearms, in violation of 18 U.S.C. §§ 922(a)(3) and 2. For the reasons explained below, the Government submits that a sentence within the stipulated Guidelines range of 57 to 71 months' imprisonment is warranted in this case.

    **I.   Offense Conduct and Procedural History**

    Between March and July 2022, the defendant sold twenty firearms to an undercover officer (the "UC"). *See* Presentence Investigation Report ("PSR") ¶ 16. The defendant's first sale to the UC occurred on or about March 23, 2022. *See id.* ¶ 12. On that day, the UC arranged to meet the defendant near her apartment building (the "Building"), which is located in the vicinity of Beach Avenue in the Bronx, New York. *See id.* When the UC arrived, the defendant left the Building and entered the UC's car, which was parked nearby. *Id.* ¶ 13. The defendant handed the UC a white bag and told the UC, "You can look at it if you want. This is the Glock 17." *Id.* The UC examined the firearm and paid the UC approximately $1,400 for the gun. *Id.* The defendant then began looking through her cellphone and told the UC, "He told me to show you the . . ." *Id.* ¶ 14. She then showed the UC a photograph of a second gun and stated, "Same thing. It's a 45[,]" referring to the price and caliber of the second gun. *Id.* The UC agreed to purchase the second gun, as well as ammunition, so the defendant left the UC's car and returned after a short time with the gun. *Id.* ¶ 14. The UC ultimately paid $1,200 for the second firearm and ammunition. *See id.* ¶¶ 14, 16.[1]

---

[1] Paragraph 14 of the PSR indicates that the UC paid $1,400 for the second firearm, while Paragraph 16 states that the transaction was $1,200. The latter is correct.

February 6, 2023
Page 2

Over the course of the four months, the defendant sold the UC eighteen more firearms, including one with an obliterated serial number, and ammunition. *See* PSR ¶¶ 16, 30. The defendant also sold the UC magazines. *See id.* ¶ 16. Some of the magazines the defendant sold were extended and drum magazines, which can equip a gun to fire large numbers of bullets. *See id.* During these transactions—all of which occurred in the Bronx—the defendant earned over $26,000, and at no point did she have a license to deal, import, or manufacture firearms. *See id.* ¶¶ 15–16.

The defendant obtained at least some of the guns she sold to the UC from Florida. Before two of the sales—on June 8, 2022 and July 14, 2022—the defendant traveled by bus from New York to Florida and back. *See id.* ¶¶ 23–25. Two of the firearms the defendant sold to the UC after her June trip had recently been purchased in Florida. *Id.* ¶ 22; *see also* Dkt. 1 ("Compl.") ¶¶ 12, 16. And in conversations with the UC, the defendant indicated that she came back to New York with five firearms at a time and that she sold firearms to other people. *See* Compl. ¶¶ 5(f), 10(a)–(b); *see also* PSR ¶¶ 17–18.

Law enforcement arrested the defendant on July 14, 2022, after she sold the UC three firearms, four standard magazines, one extended magazine, one drum magazine, and ammunition for approximately $5,800. *See* PSR ¶¶ 25, 29. She was charged by complaint and detained by this Court the following day.

On July 26, 2022, a grand jury sitting in this District returned an indictment (the "Indictment"), charging the defendant with the following four crimes: (i) firearms trafficking—specifically, engaging in the business of dealing firearms without a license—in violation of firearms trafficking, in violation of 18 U.S.C. §§ 922(a)(1)(A), 924(a)(1)(D), and 2 ("Count One"); (ii) interstate transportation and receipt of firearms, in violation of 18 U.S.C. §§ 922(a)(3) and 2 ("Count Two"); (iii) interstate travel to engage in firearms trafficking, in violation of 18 U.S.C. §§ 924(n) and 2 ("Count Three"); and (iv) firearms trafficking, in violation of 18 U.S.C. §§ 933(a)(1), 933(a)(3), and 2 ("Count Four").

On November 9, 2022, the defendant pled guilty to Counts One and Two of the Indictment. Her plea was pursuant to a plea agreement in which she agreed to a stipulated Guidelines range of 57 to 71 months' imprisonment, based on an offense level of 25 and a criminal history category of I.

On January 31, 2023, the Probation Department issued the PSR. The report calculated the applicable Guidelines range as 57 to 71 months' imprisonment—the same as the parties' stipulated Guidelines range. PSR ¶ 92. Probation recommends a sentence of 42 months' imprisonment, followed by three years of supervised release. *See id.* at 24. For the reasons discussed below, the Government believes that a sentence within the Guidelines range of 57 to 71 months' imprisonment is appropriate in this case.

## II. Applicable Law

Following *United States v. Booker*, 543 U.S. 220 (2005) and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the Guidelines continue to provide a critical touchstone. Indeed, while the Guidelines are no longer mandatory, they remain in place, and district courts must "consult" them and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme

February 6, 2023
Page 3

Court has stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in 18 U.S.C. § 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)–(7). *See Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant;
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### III. A Sentence Within the Guidelines Range Is Sufficient But Not Greater Than Necessary

The Government respectfully submits that the Section 3553(a) factors weigh in favor of a sentence within the Guidelines range of 57 to 71 months' imprisonment. The factors particularly applicable here include the need for the sentence to reflect the nature and seriousness of the offense, to afford adequate deterrence to this defendant and others, to protect the public from further crimes of the defendant, and to promote respect for the law. 18 U.S.C. § 3553(a)(2)(A)–(C).

The defendant's decision to obtain and sell firearms illegally was extremely serious. Her actions have placed those in her community in danger and have contributed to the risk of gun violence in New York City. As this Court recognized when detaining the defendant, "[f]ew actions pose a greater danger to the community than the illegal sale of firearms. . . . [W]e see the deadly consequences of the illegal sale of firearms almost every day in this city, with terrifying and perhaps unprecedented gun violence." Dkt. 6 at 23. Other courts in this District have acknowledged the same concern. *See, e.g.*, *United States v. Morgan*, No. 21 Cr. 556 (PGG), Dkt. 31 at 14 (S.D.N.Y. June 2, 2022) ("[S]omeone who sells semiautomatic handguns in our community, thereby indicates that he has no concern for the community. These guns cause

February 6, 2023
Page 4

enormous damage in our community every single day. We read every day about some innocent bystander, often children just like the defendant's own daughters, who are the unintended victims of gun violence caught in the middle.").

      The defendant played an important role in attempting to spread illegal guns throughout the city. There are no gun manufacturers in New York City. But lack of access to firearms and strict local gun laws create a black market that allow gun traffickers to sell guns for quick money. As a result, guns flow into the city via traffickers, who travel by car, train, plane, and bus from outside of the state, often through the so-called "Iron Pipeline"—the very pipeline that the defendant traveled along by bus to obtain and transport firearms. *See* NYC, The Blueprint to End Gun Violence, at 5 (Jan. 24, 2022), https://www.documentcloud.org/documents/21185516-nyc-mayors-blueprint-to-end-gun-violence. The Iron Pipeline refers to six states along the I-95 corridor—Pennsylvania, Virginia, North Carolina, South Carolina, Georgia, and, relevant here, Florida—that provide a "steady stream" of firearms to New York. Office of the Attorney General of New York, Target on Trafficking: New York Crime Gun Analysis, https://targettrafficking.ag.ny.gov/ (last accessed Feb. 6, 2023). Specifically, the New York Attorney General estimates that 70% of guns trafficked into New York come from Iron Pipeline states. *Id.* When the defendant obtained guns from Florida to sell illegally, she too made use of this pipeline and brought dangerous guns into New York City.

      The defendant's criminal conduct cannot be taken lightly. At a time when gun violence is so prevalent, the need for general deterrence is particularly striking. *See United States v. Cavera*, 550 F.3d 180, 195–96 (2d. Cir. 2008) (discussing district court's decision to consider New York market conditions in order to accomplish the goal of general deterrence in a gun trafficking case and holding no abuse of discretion). A Guidelines sentence of incarceration would send a message to the defendant and others like her that gun trafficking will not be tolerated in this District.

      In requesting a sentence of time served, the defense raises potentially mitigating factors, including the defendant's unstable childhood, age, minimal criminal record, and mental health concerns. Like so many defendants who appear in this courthouse, the defendant has had a difficult past. But that does not diminish the seriousness of her conduct. Her actions in this case do not represent a temporary lapse in judgment. Instead, they are the product of repeated decisions—over the course of four months—to sell guns illegally, not only to the UC but also to others. In order to sufficiently protect the public and promote deterrence and respect for the law, a Guidelines sentence is warranted.

February 6, 2023
Page 5

## IV. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence within the stipulated Guidelines range of 57 to 71 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the legitimate purposes of sentencing.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:  s/
Ni Qian
Madison Reddick Smyser
Assistant United States Attorney
(212) 637-2364/-2381

Cc:   All counsel (by ECF)